UNITED STATES of America, Appellant,

v.

Eric MILLAN and Ralph Rivera, Defendants–Appellees.

Nos. 2093, 2094, Docket 93–1449, 93–1470.

United States Court of Appeals, Second Circuit.

Argued July 15, 1993.

Decided Sept. 1, 1993.

Dietrich L. Snell, Asst. U.S. Atty. for the S.D.N.Y., New York City (Mary Jo White, U.S. Atty. for the S.D.N.Y., of counsel), for appellant.

Michael H. Gold, New York City (Hoffman & Pollok, Michael B. Pollack, of counsel), for defendant-appellee Millan.

David M. Richman, New York City, for defendant-appellee Rivera.

Before: MAHONEY, McLAUGHLIN, and JACOBS, Circuit Judges.

MAHONEY, Circuit Judge:

The United States appeals from orders dated May 21, 1993 and June 23, 1993 of the United States District Court for the Southern District of New York, Shirley Wohl Kram, *Judge,* that released Ralph Rivera and Eric Millan, respectively, from pretrial detention. The district court ruled regarding Rivera that "given the length of detention that has already occurred and the non-speculative estimates of future confinement, the Government's responsibility in delaying this trial and the facts concerning risk of flight and danger to the community, the Court finds that continued detention beyond twenty-two months exceeds due process." *United States v. Rivera,* No. S9 91 Cr. 685 (SWK), slip op. at 5 (S.D.N.Y. May 21, 1993). Similarly, with respect to Millan, the court concluded that: "Although ... the evidence presented supports Millan's continued detention on the grounds of risk of flight and dangerousness, ... due to delays occasioned by the Government, the length of Millan's pretrial detention has exceeded constitutional limits." *United States v. Millan,* 824 F.Supp. 38, 39 (S.D.N.Y.1993).

The government argues that the pretrial detention in this case, while lengthy, is not constitutionally excessive considering the defendants' responsibility for the delay, risk of flight, and dangerousness to the community. We agree, and therefore reverse.

### Background

On August 1, 1991, Millan and Rivera were arrested and charged with participating in a conspiracy to distribute heroin. The government claims that Millan is the leader of an organization that distributes heroin under the brand name "Blue Thunder" in New York City, and that Rivera is Millan's "second-in-command," responsible, with another

operative, for the day-to-day supervision of the organization's activities. Both are charged with violating a variety of laws, including the Continuing Criminal Enterprise statute, 21 U.S.C. § 848 (1988), under which Millan, as a "principal administrator, organizer, or leader" of a continuing criminal enterprise, faces a mandatory life sentence, and Rivera faces a mandatory twenty-year sentence and a maximum sentence of life imprisonment. *See* §§ 848(a)–(d).

Millan and Rivera have been detained at all times subsequent to their arrests. *Millan*, 824 F.Supp. at 39; *Rivera*, slip op. at 1. Magistrate Judge Michael H. Dolinger ordered Rivera detained as presenting a risk of flight after a detention hearing on August 6, 1991. Millan consented to pretrial detention at a hearing before Magistrate Judge Theodore H. Katz on August 13, 1991, upon the government's motion that he posed both a risk of flight and a danger to the community.

Millan did not thereafter seek bail prior to the application at issue on this appeal. Rivera, on the other hand, made two intervening bail applications after his initial detention hearing. On the first occasion, Judge Kram, to whom the case was assigned, referred the motion to Magistrate Judge Naomi R. Buchwald, who affirmed the original detention order on May 19, 1992. On the second, Magistrate Judge James C. Francis, IV denied Rivera's bail proposal on December 22, 1992, noting that Rivera had failed to identify any changed circumstances sufficient to warrant a departure from the findings underlying the initial detention order. Because Judge Kram was not available to hear his significantly delayed appeal of that determination, Rivera appealed Magistrate Judge Francis' decision to District Judge Sonia Sotomayor, who was then sitting in the district court's Part I (the miscellaneous docket part).

After a February 18, 1993 hearing, Judge Sotomayor concluded that the government had amply demonstrated that Rivera continued to constitute a risk of flight and a danger to the community. Judge Sotomayor found that: (1) Rivera was charged with a crime that required more than ten years imprisonment in the event of conviction; (2) with respect to each of three prior arrests, he had failed to appear in court, resulting in the issuance of bench warrants for his arrest; (3) Rivera no longer had significant ties to the community; (4) he had travelled abroad and had ties to communities outside New York City; and (5) as a result of his participation in the Blue Thunder organization, Rivera had access to sufficient money to facilitate flight and reimburse bail sureties should he decide to flee.

Opening statements in the trial of Millan, Rivera, and ten codefendants were made on March 9, 1993. On March 12, 1993, the prosecution advised Judge Kram that three agents involved in the investigation of this case had been arrested for narcotics trafficking. The court then adjourned the trial and held a hearing to determine the impact of this revelation upon the case. The court determined that the alleged misconduct by the arrested agents did not involve the investigation that resulted in the *Millan* indictment, *see United States v. Millan*, 817 F.Supp. 1072, 1078 (S.D.N.Y.1993); but that cross-examination by the defense concerning the arrests would be permitted in view of the government's references in its opening statement to the participation of one of the arrested agents, in an undercover capacity, in events underlying the *Millan* indictment. *See id.* at 1081–84.

On March 23, 1993, the prosecution advised Judge Kram that Millan's attorney, Michael B. Pollack, was about to be indicted on felony charges in the District of New Jersey. Although a colleague of Dietrich L. Snell, the government attorney in charge of this case, had known about the impending indictment as early as January 1993, he apparently neglected to inform Snell about this development until March. After being apprised of the conflict, which his attorney had not previously revealed to him, Millan announced his intention to retain new counsel and requested a severance from the ongoing trial. The court granted the severance application and declared a mistrial as to Millan, noting the government's concession that " 'timely disclosure of the conflict of Millan's counsel would have afforded Millan sufficient opportunity to select alternative counsel so

that he could proceed to trial with other defendants.'" 817 F.Supp. at 1086 (quoting letter from Snell to Judge Kram (Mar. 24, 1993), at 3). Millan subsequently decided, however, to continue with Pollack, and only to seek new counsel if necessary. *Millan*, 824 F.Supp. at 46 n. 5. Pollack was convicted on July 15, 1993.

On April 14, 1993, the court learned that between $50,000 and $80,000 that had been seized in the course of the arrest of one of the defendants in this case by one of the suspect agents was missing. In light of this evidence of misconduct directly relating to the *Millan* investigation, Millan, Rivera, and most of their codefendants moved for a mistrial. *See United States v. Millan*, 817 F.Supp. 1086, 1088 (S.D.N.Y.1993). Concerned that "the entire vouchering process in this case is now suspect," *id.* at 1089, and troubled by the possibility that further allegations of misconduct might be forthcoming, *see id.*, the district court granted defendants' motion for a mistrial on April 16, 1993. *See id.* at 1090. Millan, Rivera, and their codefendants then moved to bar any retrial on grounds of double jeopardy.

Millan and Rivera separately petitioned the district court to be released on bail pending retrial, each contending that his continued detention constituted punishment in violation of the Due Process Clause of the Fifth Amendment. As previously indicated, the court concluded in separate opinions that with regard to each defendant the period of pretrial delay exceeded constitutional limits. Judge Kram ruled on Rivera's application without any separate proceeding before a magistrate. The ruling on Millan was preceded by a recommendation of Magistrate Judge Katz that Millan be released; that recommendation was in turn "informed and assisted" by Judge Kram's preceding decision to release Rivera.

Accordingly, on May 21, 1993, Judge Kram ordered Rivera released on condition that he: (1) post a $1,000,000 personal recognizance bond secured by $500,000 in real property and the signatures of six financially responsible individuals; (2) not associate or communicate with any of his codefendants except as necessary to prepare his defense; (3) not commit any crimes; (4) report weekly by telephone to pretrial services; (5) submit to home detention and electronic monitoring; (6) submit to weekly drug testing; and (7) surrender his passport and all other travel documents. *Rivera*, slip. op. at 5.

Similarly, on June 23, 1993, the court ordered Millan released on condition that he: (1) post a $1,000,000 personal recognizance bond secured by $500,000 in real property and $100,000 cash and the signatures of six financially responsible individuals, including at least two family members; (2) not associate or communicate with any of his codefendants except in the presence of his lawyer to prepare his defense; (3) not commit any crimes; (4) report daily by telephone to pretrial services; (5) report weekly in person to pretrial services; (6) submit to home detention at the residence of his common-law wife and to electronic monitoring; and (7) surrender his passport and all other travel documents. *Millan*, 824 F.Supp. at 45–46. It was also required that his common-law wife surrender her passport and travel documents. *Id.*

The government appealed both orders, pursuant to Fed.R.App.P. 9(a). On June 30, 1993, Judge Kram granted the government's request for a stay of the orders pending the outcome of this appeal.

On July 30, 1993, Judge Kram issued a memorandum opinion and order that denied the pending motion to bar retrial on double jeopardy grounds and set October 12, 1993 as the date for the commencement of the retrial in this case. *United States v. Millan–Colon*, 829 F.Supp. 620, 637 (S.D.N.Y.1993). In so ruling, she found "no indication based on an objective review of the facts that the Government acted with the intent to provoke the defendants into moving for a mistrial." *Id.* at 628. Also, after reviewing the status of the investigation of police misconduct that affected the *Millan* investigation, Judge Kram concluded that "this trial can resume

without fear of further disruption stemming from unforeseen sources." *Id.* at 634.

## Discussion

█ The government may detain a defendant prior to trial consistent with the Due Process Clause of the Fifth Amendment so long as confinement does not amount to "punishment of the detainee." *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979); *see also United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987) (pretrial detention must be "regulatory, not penal"). Absent an expressed intention to punish, whether detention constitutes impermissible punishment or permissible regulation turns on whether the government has a nonpunitive reason for detention and whether detention " 'appears excessive in relation to' " the nonpunitive purpose. *Wolfish,* 441 U.S. at 538, 99 S.Ct. at 1873 (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 169, 83 S.Ct. 554, 568, 9 L.Ed.2d 644 (1963)). Pretrial detention of a defendant, when of reasonable duration, serves important regulatory purposes, including the prevention of flight and the protection of the community from a potentially dangerous individual. *Salerno,* 481 U.S. at 747–49, 107 S.Ct. at 2101–02; *United States v. Gonzales Claudio,* 806 F.2d 334, 338 (2d Cir.) (prevention of flight is valid regulatory goal), *cert. dismissed,* 479 U.S. 978, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986). However, when detention becomes "excessively prolonged," it may no longer be reasonable in relation to the regulatory goals of detention, in which event a violation of due process occurs. *See Salerno,* 481 U.S. at 747 n. 4, 107 S.Ct. at n. 4; *Gonzales Claudio,* 806 F.2d at 339.

█ To determine whether the length of pretrial detention has become constitutionally excessive, we must weigh three factors: "(i) the length of detention; (ii) the extent of the prosecution's responsibility for the delay of the trial; and (iii) the strength of the evidence upon which the detention was based," *United States v. Orena,* 986 F.2d 628, 630 (2d Cir.1993); that is, the evidence concerning risk of flight and danger to the safety of any other person or the community. *See id.* (applying test to dangerousness); *United States v. Ojeda Rios,* 846 F.2d 167, 169 (2d Cir.1988) (per curiam) (applying test to risk of flight and dangerousness).

█ A district court's determination as to any of these factors is normally reviewed for clear error. *See United States v. Melendez–Carrion,* 820 F.2d 56, 60 (2d Cir.1987) (government responsibility for delay); *United States v. Chimurenga,* 760 F.2d 400, 405 (2d Cir.1985) (danger to community and risk of flight). In determining, however, the ultimate question whether a due process violation is established, "we are entitled to apply a broader standard of review in determining the extent to which the facts regarding risk of flight, as found by the District Court, have significance on the constitutional issue of whether continued detention violates due process limitations." *Gonzales Claudio,* 806 F.2d at 343; *see also United States v. Jackson,* 823 F.2d 4, 8 (2d Cir.1987) (same); *United States v. Gallo,* 653 F.Supp. 320, 327 (E.D.N.Y.1986) (same). Further, although *Gonzales Claudio* addressed the constitutional question in the context of risk of flight, it cited in support of the quoted statement *United States v. Zannino,* 798 F.2d 544, 546 (1st Cir.1986) (per curiam), in which the First Circuit explicitly invoked *de novo* review regarding the release on constitutional grounds of a person whom the government sought to detain as a danger to the community. *Cf. United States v. Rodriguez,* 950 F.2d 85, 88 (2d Cir.1991) (noting that clear error standard might not apply to statutory review of finding of dangerousness) (citing *United States v. Melendez–Carrion,* 790 F.2d 984, 994 (2d Cir.1986)); *United States v. Shakur,* 817 F.2d 189, 195–97 (2d Cir.) (reviewing and harmonizing Second Circuit decisions regarding appellate review of statutory issues presented by bail determinations), *cert. denied,* 484 U.S. 840, 108 S.Ct. 128, 98 L.Ed.2d 85 (1987).

In sum, we review the district court's findings of historical fact in this case for clear error, but we review its ultimate resolution of the constitutional due process issue *de novo.* We now turn to a consideration of the determining factors that must be addressed to resolve that issue.

### A. *Length of Pretrial Detention.*

Millan and Rivera have been detained continuously since the day of their arrest, a

period exceeding twenty-four months. Judge Kram has scheduled the second trial to begin on October 12, 1993, and expects that the retrial will take four to five months. *See Millan,* 824 F.Supp. at 39–40; *Rivera,* slip. op. at 3. Thus, by the end of the second trial, Millan and Rivera will have been detained between thirty and thirty-one months without a formal finding of guilt.

■ A period of pretrial detention of this length is, as the government concedes, "a factor in appellees' favor" in finding a due process violation. *Cf. Gonzales Claudio,* 806 F.2d at 341 ("Detention that has lasted for fourteen months and, without speculation, is scheduled to last considerably longer, points strongly to a denial of due process.") (citing *Zannino,* 798 F.2d at 548 ("we shall assume that in many, perhaps most, cases, sixteen months would be found to exceed the due process limitations on the duration of pretrial confinement")). It is not, however, dispositive. Length of detention "will rarely by itself offend due process." *Orena,* 986 F.2d at 631. This court has upheld projected pretrial detention periods of up to thirty-two months. *See Melendez–Carrion,* 820 F.2d at 60–61. When one of the *Melendez–Carrion* defendants later renewed his motion for conditional release pending trial, we ordered his release only after he had spent over thirty-two months in detention, and faced the prospect of at least four additional months of pretrial detention in addition to "many months" of confinement during the trial itself. *Ojeda Rios,* 846 F.2d at 168–69. While ordering the detainee's release, furthermore, we cautioned that we were not "attempting to set a bright-line precedent for future cases." *Id.* at 169. A prospective detention period of the length at issue here, while weighing in favor of release, does not, standing alone, establish that pretrial confinement has exceeded constitutional limits.

As noted earlier, Millan and Rivera moved to bar their retrial on the basis of double jeopardy, and Judge Kram denied that motion in her July 30, 1993 memorandum opinion and order. Millan and Rivera have contended on this appeal that in the event of such a denial, appeals to this court and, if necessary, to the Supreme Court would delay retrial to the point that due process would be clearly violated. In weighing potential future detention, however, we take into account "non-speculative aspects of future confinement." *Melendez–Carrion,* 820 F.2d at 60; *see also Gonzales Claudio,* 806 F.2d at 341. Millan and Rivera's argument on this issue is highly speculative, for it is unlikely that appellate review of the denial of their double jeopardy motion will further delay the commencement of retrial.

■ It is settled law that double jeopardy bars retrial after a mistrial requested by the defense only if the government intentionally provoked the defense into making the request. *See Oregon v. Kennedy,* 456 U.S. 667, 676, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416 (1982); *United States v. Huang,* 960 F.2d 1128, 1133 (2d Cir.1992). In this case, Judge Kram has twice stated her belief that the government did not seek to provoke a mistrial, *see Millan–Colon,* 829 F.Supp. at 628–29; *Millan,* 817 F.Supp. at 1089, and we perceive no basis in the record before us for a contrary determination. A district court may retain jurisdiction and proceed to trial, despite the pendency of a defendant's interlocutory double jeopardy appeal, when the appeal is frivolous. *See United States v. Salerno,* 868 F.2d 524, 539 (2d Cir.) (collecting decisions by nine circuit courts of appeal), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989).

■ Judge Kram has implicitly decided this issue adversely to appellants in this case by setting a firm trial date in the aftermath of her double jeopardy ruling. Based upon the presently available information and without any intention of prejudicing an appeal on a full record, we consider it very probable that the appeal from the denial of appellants' double jeopardy motion will not delay the commencement of the retrial. That appeal accordingly provides no nonspeculative basis to anticipate further delay in the commencement of the retrial of this case.

### B. *Delay Attributable to the Government.*

■ In assessing this factor, the district court found that the prosecution bore respon-

sibility for "a portion of the pretrial delay," which "weigh[ed] in favor of ordering [the defendants'] conditional release." *Millan,* 824 F.Supp. at 42; *see also Rivera,* slip op. at 3–4. The court absolved the government of responsibility for the first nineteen months of delay, which it found was "largely attributable to defense counsel adjournments." *Rivera,* slip op. at 3; *see also United States v. Kercado,* No. 91 Cr. 685 (SWK), 1992 WL 196778, at *2 (S.D.N.Y. Aug. 3, 1992) (finding as to codefendant, after twelve months of detention, that "the Government is not responsible for the length of time that has elapsed from the time of the underlying indictment"). However, the court found that in Rivera's case, the prosecution's failure to bring the allegations of police misconduct to the court's attention prior to the commencement of the initial trial rendered the government "primarily, if not solely, responsible for the trial's delay since April 16, 1993." *Rivera,* slip op. at 3. Similarly, because the government failed to notify the court of Pollack's pending indictment on felony charges, the district court found that in Millan's case, the government was primarily responsible for all delay since March 24, 1993, when Millan elected a mistrial upon learning about Pollack's indictment. *Millan,* 824 F.Supp. at 42.

It is not clear to us that the government should be accorded sole responsibility for the severance required by Millan's lack of awareness of Pollack's indictment. There was concededly a failure of communication in the office of the United States Attorney for the Southern District of New York for some time between the attorney in that office who was aware of Pollack's indictment and Snell, who was not. Certainly, however, Pollack had at least equal responsibility to advise the court and his client of his predicament. We note also that although the district court directed Millan to obtain new counsel after the mistrial, he instead opted to "wait and see" whether Pollack would be acquitted. *Millan,* 824 F.Supp. at 46 n. 5. In addition, the government represented to us in a letter dated July 30, 1993 that Rivera had obtained a change of his court-appointed counsel in this case four times, most recently discharging on July 30 the attorney who represented him on this

appeal, and that Millan had not obtained substitute counsel for Pollack at that date. Thus, it appears that as of July 30, 1993, neither Millan nor Rivera was represented by counsel.

The primary reason for the delay since March 1993 has nonetheless been the government's failure to advise the court prior to the initial trial concerning the misconduct of certain of the agents who participated in the *Millan* investigation. There is no suggestion that this failure was intentional; the district court explicitly stated that "the Court does not doubt that the Assistant United States Attorneys prosecuting this case were unaware of the Robles investigation" prior to the time that they reported it to the court. *Millan,* 817 F.Supp. at 1086 n. 11. The failure of communication in their office has nonetheless caused significant delay in bringing this case to trial.

We conclude that this factor weighs in favor of Millan and Rivera, but to a significantly lesser extent than the district court concluded in view of the primary responsibility of Millan and Rivera for the delay between their arrest and retrial.

*C. Strength of Evidence Supporting Detention.*

As previously indicated, this factor requires consideration of the strength of the prosecution's evidence regarding the risk that Millan and Rivera will flee, and the danger their release would pose to any other person and the community.

*1. Risk of Flight.*

In ordering Rivera released on bail, Judge Kram performed only a brief review of the evidence concerning risk of flight. She noted the defendant's proffered explanations for several bench warrants that had been issued against Rivera in criminal actions in New York courts, but stated that, "the Court is not in a position to assess the validity of these explanations." *Rivera,* slip op. at 4. She also noted that Rivera "ha[d] lived his entire life in New York City and ha[d] solid verifiable ties to the community, including his mother, wife and five children." *Id.* Essen-

tially, however, Judge Kram concluded that whatever risk of flight Rivera might pose, due process required his release in view of the length of his detention and the government's responsibility for delaying the trial. *See id.* at 4–5.

As noted earlier, Judge Sotomayor took a less favorable view concerning the bench warrants and the significance of Rivera's current ties to the community. Judge Sotomayor also stressed the potential sentence faced by Rivera, his travels abroad and ties to communities outside New York City, and his financial ability, as a result of his dealings in heroin, to facilitate flight and reimburse bail sureties. Judge Kram did not address these matters. Whether or not Judge Kram should have accorded some deference to the prior determination by Judge Sotomayor under the doctrine of law of the case, *cf. Melendez–Carrion,* 820 F.2d at 60 n. 1; *Gonzales Claudio,* 806 F.2d at 337, it is clear that the matters considered by Judge Sotomayor have a legitimate bearing upon, and must be considered in assessing, Rivera's risk of flight. In addition, knowledge regarding the government's case that Rivera obtained during the aborted initial trial, as well as from a brief period of cooperation during which the government made Rivera privy to substantial evidence of his guilt, provides a considerable additional incentive to flee. We deem that risk high, for the same reasons that Judge Sotomayor did. Indeed, we do not understand Judge Kram to be in essential disagreement with that view, but rather to have regarded the risk of Rivera's flight, however serious, to be outweighed by the other applicable factors.

This is even more clearly the case with respect to Millan. Judge Kram noted that as the head of the Blue Thunder organization, Millan had received a sizable portion of the $65 million in heroin revenues collected by the organization during the forty months for which the government seized financial records, some of which he had secreted overseas. *Millan,* 824 F.Supp. at 42. The court also acknowledged that Millan had travelled extensively in South America. *Id.* While it noted various factors mitigating the risk of flight, such as Millan's ties to the New York area, the court found, on balance, that

> the serious nature of the crimes charged, the central role Millan allegedly played in heading the organization responsible for those crimes, his obvious incentive to flee in light of a potential life sentence, and the extent and weight of the evidence indicating his culpability all point towards a serious risk of flight in the case at hand.

*Id.* at 44.

Despite this assessment, Judge Kram concluded that "at some point risk of flight must be accepted in order to avoid a deprivation of constitutional rights," and that "[t]hat point has been reached." *Id.* In so ruling, she relied heavily upon our decisions in *Ojeda Rios* and *Gonzales Claudio.* As we have indicated, however, *Ojeda Rios* involved a significantly longer period of detention than this case. *Gonzales Claudio* presented at least a twenty-six month period of anticipated confinement, *see* 806 F.2d at 341, and significantly greater governmental responsibility for the overall delay than is presented here. *See id.* at 341–43; *cf. Melendez–Carrion,* 820 F.2d at 60–62 (reassessing government's responsibility for delay in same case in light of additional evidence, and authorizing continued confinement of codefendants for anticipated total period of thirty-two months).

We conclude that both Rivera and Millan present a high risk of flight, and proceed to consider the danger to any person or the community that would result from their release on bail.

2. *Danger to Any Person or the Community.*

 The rulings of both Judge Sotomayor and Judge Kram regarding Rivera on this issue were entirely conclusory. Judge Sotomayor simply stated that Rivera "continues to be a danger to this community," relying in this respect upon the prior rulings of three magistrate judges who had considered the issue of Rivera's release. Judge Kram ruled, without elaboration, that "the Court finds that the bail conditions proposed by defense counsel will adequately ensure the

safety of community members." *Rivera*, slip op. at 4.

> There is a statutory presumption that
>
> no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Import and Export Act (21 U.S.C. § 951 et seq.).

18 U.S.C. § 3142(e) (1988 & Supp. II 1990). That presumption is obviously applicable to Rivera (and Millan) in this case. *Cf. Rodriguez*, 950 F.2d at 88 (presumption continues to be weighed even after presentation of rebuttal evidence); *Jackson*, 823 F.2d at 6–7 (same). In addition, in making a release assessment, a judicial officer must take into account:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or *involves a narcotic drug;*
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, *criminal history,* and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was *on probation,* on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g)(1)–(4) (1988 & Supp. II 1990) (emphasis added).

In assessing these considerations, we note that Rivera was arrested in 1982 for possession of a controlled substance, was again arrested in 1983 for loitering and the unlawful use of a controlled substance, and pled guilty to these charges. Rivera was convicted of criminally negligent homicide in the 1983 shooting death of his wife. Moreover, much of the ongoing criminal activity charged in the indictment occurred during Rivera's five years of probation following his homicide conviction.

The district court's assessment of Millan's dangerousness was more extensive. At the outset of the memorandum in which his release was ordered, the court explicitly stated that "the evidence presented supports Millan's continued detention on the ground[ ] of dangerousness," *Millan*, 824 F.Supp. at 39, but concluded that such detention was constitutionally impermissible. *Id.* Its subsequent discussion of the issue, however, expressed a more mixed view.

After summarizing testimony by former Blue Thunder confederates that Millan had ordered numerous shootings, beatings, and a contract murder, and had issued threats against the families of witnesses who testified adversely to him at trial, the court stated that Millan did not "present[ ] a danger to any specific individual," *id.* at 44, noting that he had not individually threatened the testifying confederates or their families, and that the cooperating witnesses "had difficulty attributing any specific acts of violence directly to Millan" because (in the words of one of the witnesses) he "gets others to do his dirty work for him very often." *Id.*

The court then inferred that the principal concern raised by the prosecution was the prospect that Millan would "return to criminal activity to the detriment of the community." *Id.* at 45 (citing *United States v. Leon,* 766 F.2d 77, 81 (2d Cir.1985) ("it is clear that the harm to society caused by narcotics trafficking is encompassed within Congress definition of 'danger' ")). The court concluded that an adequate likelihood of recidivism had not been established to warrant continued confinement, noting that "the offenses charged are Millan's first and that his alleged misconduct occurred over two years ago [i.e.,

before he was detained]". The court's ultimate conclusion was that "continued detention, beyond twenty-three months, of a person presumed to be innocent is fundamentally unfair and violates due process." *Id.*

In our view, the district court employed an erroneous analysis in assessing the danger that Millan posed to "the safety of any other person or the community" within the meaning of 18 U.S.C. § 3142(e)–(g) (1988 & Supp. II 1990). The court invoked a statement in S.Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3195, that: "The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern...." The report goes on to state that "the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community." *Id.* The district court concluded, in effect, that because drug trafficking falls within the concept of danger to the community, the prosecution's contentions that Millan posed a danger to the community should be *confined* to the likelihood that he would resume such activity; and that the absence of a particularized threat to intimidate a specific witness precluded a finding that Millan posed a danger to the safety of "any other person."

We reject this analysis. Our ruling in *Leon* that narcotics trafficking constitutes "criminal activity to the detriment of the community" of the sort envisioned by the Senate report should not be read to imply that obstruction of justice by intimidation of witnesses does not fit within the concept. Further, the notion that only threats to particular, specified witnesses provide a basis for detention is contravened by our ruling in *United States v. Gotti,* 794 F.2d 773 (2d Cir.1986).

In that case, a specific past instance of witness tampering was deemed to provide an adequate basis for confinement in the face of Gotti's claim that "the due process clause prohibits pretrial detention based on a prediction that a defendant will *intimidate witnesses* because he has done so in a prior case." *Id.* at 779 (emphasis added). The

district court opinion that we affirmed was similarly unspecific, concluding only that "if continued on bail John Gotti would improperly *influence or intimidate witnesses* in this case." *United States v. Gotti,* 634 F.Supp. 877, 887 (E.D.N.Y.) (emphasis added), *aff'd,* 794 F.2d 773 (2d Cir.1986).

Neither the district court nor this court required the identification of a particular trial witness or witnesses that might be the object of influence or intimidation. We reject the notion that such an identification is required in the instant case, where credible testimony has been presented that Millan repeatedly threatened to harm any witnesses that might testify against him, and their families. *Cf. Rodriguez,* 950 F.2d at 88 (repudiating requirement imposed by district court that "the violent conduct witnessed by the informant be connected to the activity charged in the indictment").

We conclude that the district court did not adequately examine the issue of dangerousness with respect to Rivera, and conducted a legally flawed examination with respect to Millan. *See Shakur,* 817 F.2d at 196 ("The clearly erroneous standard does not apply to the district court's ultimate finding ... if the court has made an error of law.") (citing *Melendez–Carrion,* 790 F.2d at 994). It is our view that both Rivera and Millan would pose a very serious danger to the community in the event of their pretrial release on bail. We note in this respect that:

> the constitutional limits on a detention period based on dangerousness to the community may be looser than the limits on a detention period based solely on risk of flight. In the former case, release risks injury to others, while in the latter case, release risks only the loss of a conviction.

*Orena,* 986 F.2d at 631.

### D. *Confinement or Release on Conditions.*

The ultimate statutory issue presented in this case is whether "there are conditions of release that will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(g). We conclude that there are not. The sort of

electronic surveillance suggested by the defendants and approved by the district court can be circumvented. *See Orena,* 986 F.2d at 632. Home detention and electronic monitoring "at best 'elaborately replicate a detention facility without the confidence of security such a facility instills.'" *Id.* (quoting *United States v. Gotti,* 776 F.Supp. 666, 672 (E.D.N.Y.1991)). If the government does not provide staff to monitor compliance extensively, "protection of the community would be left largely to the word of [Millan and Rivera] that [they] will obey the conditions." *Id.* at 633. The appearance of Millan and Rivera at their forthcoming trial and the protection of the community can be assured only by continued detention.

For the reasons stated earlier, furthermore, we conclude that such detention does not violate due process. To summarize, the length of the detention, standing alone, does not constitute a constitutional violation in light of the applicable precedents of this court. In addition, we regard the government's responsibility for delay in this prosecution to be considerably less significant than did the district court, and evaluate the danger to the community that would result from the conditional release of Millan and Rivera as substantially greater, under a proper legal analysis, than the district court's assessment of that danger. Taking these factors into account, together with the concededly high risk of flight posed by Millan and Rivera, we discern no constitutional impediment to their continued detention.

## Conclusion

The orders of the district court releasing Millan and Rivera are reversed.